**Linda WILLIS, Plaintiff,**

v.

**ITT EDUCATIONAL SERVICES, INC., et al., Defendants.**

**No. C–3–02–047.**

United States District Court, S.D. Ohio, Western Division.

Feb. 24, 2003.

John Adams Cervay, Dayton, OH, for Plaintiff.

Philip Fred Brown, Michael E. Heffernan, Brenner, Brown Golian & McCaffrey, Columbus, OH, for Defendants.

DECISION AND ENTRY SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW; OPINION OVERRULING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (DOC. # 12) AND OVERRULING DEFENDANTS' CROSS-MOTION FOR JUDGMENT ON THE MERITS (DOC. # 17); THIS MATTER IS TO BE REMANDED TO DEFENDANT CNA FOR FURTHER CONSIDERATION OF THE PLAINTIFF'S APPEAL FOR ERISA BENEFITS; TERMINATION ENTRY

RICE, Chief Judge.

This is a claim for benefits arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"). The Plaintiff in this case is Linda Willis, a former employee of Defendant ITT Educational Services, Inc. ("ITT"). Willis ended her employment as an outside education recruiter with ITT in 1998, due to a disabling condition. She received short-term disability benefits, and then for a 24–month period thereafter she received long-term disability benefits ("LTD benefits"), pursuant to a group LTD plan ("Plan") administered and sponsored by ITT, and offered by Defendant CNA, Continental Casualty Company ("CNA"). After CNA denied her claim for permanent LTD benefits, effective September 12, 2000, she filed this suit.

A copy of the administrative record has been filed with the Court (Doc. # 13), and the parties have filed cross-motions for judgment with respect thereto (Doc. # 12 (captioned Plaintiff's Motion for Judgment on the Administrative Record); Doc. # 17 (captioned Defendants' Motion for Judgment on the Merits)). Herein, the Court will set forth its findings of fact, opinion, and conclusions of law.

I. *Findings of Fact* [1]

1. Insured employees of ITT were provided with a booklet summarizing the terms of the Plan and the benefits provided thereunder. (AR at 015–033.)

2. ITT was listed as the Plan Administrator. (*Id.* at 030.)

3. CNA was a Plan fiduciary. (Amend. Compl. ¶ 4; Answer to Amend. Compl. ¶ 4.)

4. Under the terms of the Plan, following a 180–day waiting period, an insured was entitled to 24 months of LTD benefits if she could demonstrate that she was "totally disabled," which required proof that she was "continuously unable to perform the substantial and material duties of [her] regular occupation," was "under the regular care of a licensed physician," and was "not gainfully employed in any occupation for which [she was or would become] qualified by education, training or experience." (AR at 022.)

5. After the expiration of the initial 24–month period, an insured was entitled to continued LTD benefits, provided she could demonstrate that she was "continu-

---

1. The administrative record consists of 229 numbered pages. The Court will refer to such as "AR at [page # ]."

ously unable to engage in any occupation for which [she was or would become] qualified by education, training or experience," and remained "under the regular care of a licensed physician." (*Id.*)

6. The Administrator and other Plan fiduciaries had the discretionary authority to interpret the terms of the Plan and to determine eligibility for, and entitlement to, benefits in accordance with the Plan. (*Id.* at 030.)

7. Written proof of the insured's loss (i.e., her disability) was due within 90 days after the end of the period of loss for which CNA was liable, or as soon as reasonably possible, no later than one year after the time it was otherwise due (unless the insured/claimant was incapacitated). CNA was then to commence monthly LTD benefits payments to the insured immediately after it received "due written proof of loss." (*Id.* at 026.)

8. On March 16, 1998, Willis was treated by Naynesh Patel, M.D., for a pain in her limbs. Dr. Patel diagnosed her condition as neuropathy and excused her from work until April 20, 1998. That expected return date was later extended, but as it turns out, she never returned to work. (*Id.* at 146, 200, 201, 214.)

9. Dr. Patel referred Willis to James F. Sheridan, M.D., whom she visited on April 2, 1998, complaining of pain in her right leg and buttock. She complained that her pain was aggravated by prolonged sitting and standing, but relieved by reclining. After a series of follow-up visits and tests, including an MRI, a C.T. scan, a myelogram, and a post-myelogram C.T. scan, Dr. Sheridan was unable to identify the cause of Willis' pain. The radiologist who reviewed the results of her myelogram and post-myelogram C.T. scan, Steven Strickler, M.D., suggested the possibility of mild arachnoiditis. On May 14, Dr. Sheridan noted in a written report to Dr. Patel that if Dr. Strickler's suggestion of

arachnoiditis were correct, Willis would not be able to expect any permanent relief from her pain. He suggested to Dr. Patel that he examine Willis further for the possibility of a degenerative condition in her right hip joint. (*Id.* at 187–188, 195.)

10. Around the same time, and upon a second referral from Dr. Patel, Willis visited David K. Johnson, M.D., who was unable to provoke her leg pain in his office or provide a more extensive diagnosis of the condition causing her pain. In his written report to Dr. Patel, also dated May 14, 1998, Dr. Johnson suggested a short course of therapy, followed by epidural injections if necessary. (*Id.* at 185–186.)

11. After a follow-up visit on July 27, 1998, Dr. Johnson released Willis to return to work, but restricted her to an occupation that did not require her to drive prolonged distances or lift more than ten pounds, and which allowed her to change her position every 15 minutes and occasionally rest. These restrictions precluded her ability to return to her previous occupation, and he noted that if she were unable to be accommodated, she would have to be regarded as permanently disabled. Her official diagnosis at that point was lumbar arachnoiditis with neurogenic claudication. (*Id.* at 167 & 182.)

12. ITT was not able to accommodate her work restrictions, and at some point shortly after her July visit to Dr. Johnson, Willis filed a claim for LTD benefits.

13. Following a return visit on August 20, 1998, Dr. Johnson noted in a written report to Dr. Patel that he thought it was "at best marginal that she could return to long-term gainful employment." (*Id.* at 181.)

14. In response to her claim, Willis was interviewed by a CNA claims adjuster on September 29, 1998. Willis expressed a desire to return to work, but skepticism as

to her options, in light of Dr. Johnson's restrictions. She reported the following details about her life while away from work: she would go to bed around 11:00 p.m. and wake around 6:30 a.m.; she shopped for groceries with her husband; she was unable to go to church; her daughters in the area helped her with cooking and her 32–year–old son had moved in with her and her husband to help around the house; she was able to dust and do laundry to an extent; she read, and watched television for about four or five hours a day; she was unable to hike or go to the park as she had done before the onset of her pain; she could only sit for about 35 to 45 minutes before she would have to lie down; and she napped for about an hour in the afternoons. (*Id.* at 159–160.)

15. Subsequently, CNA forwarded copies of Willis' medical records to Eugene Truchelut, M.D., for an independent review. On October 9, 1998, Dr. Truchelut filed a written report concluding that the diagnosis of arachnoiditis was supported by Dr. Strickler's interpretation of her myelogram and C.T. scans, and that it was unlikely she would be able to continue in her previous occupation, which included long periods of driving and sitting. On the other hand, he did not believe that she would be unable to perform any sedentary occupation. He recommended that her file be reviewed by an orthopedist or neurosurgeon on the Plan's Peer Review Panel in order to determine the necessary restrictions on any future employment. (*Id.* at 141–143.)

16. Her claim for LTD benefits was approved on October 22, 1998, for a 24–month period beginning on September 12, 1998. (*Id.* at 146.)

17. A physician on the Peer Review Panel, James P. Ryan IV, M.D., reviewed her records for a period of 55 minutes on November 5, 1998. He expressed skepticism about Willis' being totally disabled for purposes of receiving LTD benefits past the initial 24–month period, and stated that it would be reasonable to require her to undergo an independent medical evaluation. For some reason, Dr. Ryan also offered his opinion, outside the scope of his expertise, that Willis might have been motivated to portray herself as disabled because her husband was also disabled, and, as such, served as a role model for her own desire to claim disability.[2] (*Id.* at 134, 138–139.)

18. An independent medical evaluation was never ordered or conducted.

19. On December 31, 1998, a CNA Vocational Rehabilitation Specialist, Eileen Glass, reported that Willis would be able to work in the following occupations, taking Dr. Johnson's restrictions on Willis' work-related activities into account: inside education recruiter (i.e., no driving involved), employment recruiter, temporary services employment counselor, and job developer. Accordingly, Ms. Glass recommended that Willis not be deemed totally disabled after the expiration of her initial 24–month period of eligibility. (*Id.* at 129–130.)

20. There is no indication of Ms. Glass' professional qualifications, other than the Defendants' unsupported claim that she is, by virtue of her title, a "Vocational Rehabilitation Specialist." (*See* Doc. 17 at 23 n. 1.)

---

**2.** Because it has not been brought to this Court's attention that Dr. Ryan is a psychologist or has any independent expertise in the behavioral sciences, the substance of this remark will be discounted in its entirety for obvious evidentiary reasons, namely relevance and competence, although, as will be discussed, the fact that the remark was made at all will bear on the Court's reasoning.

21. By letter of March 3, 1999, CNA notified Willis that her LTD benefits would not be extended past September 11, 2000, based upon the vocational assessment completed by Ms. Glass. (AR at 127–128.)

22. In mid-April, 1999, Willis provided CNA with a more recent report from Dr. Johnson, which suggested that her condition remained as before. Dr. Johnson's notes indicated that Willis was not precluded from doing sedentary work provided she could change her position as needed. (Id. at 124 & 125.)

23. On September 30, 1999, the Social Security Administration ("SSA") notified Willis in writing that she had been deemed disabled for purposes of receiving SSA benefits. CNA, too, was notified of this fact, though a basis for the SSA's determination was not provided. (Id. at 114–115, 073–080.)

24. In August of 2000, Willis provided CNA with another claim form, which indicated that her medical condition remained about the same. She indicated herself that she could not hold down a job, but there were no notes to that effect from any physician. (Id. 085.)

25. On September 12, 2000, CNA notified Willis in writing that her LTD benefits had been discontinued for the reasons set forth in its letter of March 3, 1999. CNA also informed her that she had the right to request a reconsideration of its decision within 60 days, and that if the request were turned down, her file would be forwarded to the Appeals Committee. (Id. at 082–083.)

26. Willis visited Dr. Johnson again on September 18, October 26, and November 2, 2000. In addition to her ongoing pain due to her pre-existing condition, she was diagnosed with "moderately severe" Carpal Tunnel Syndrome ("carpal tunnel") in both of her upper limbs. She was pre-

scribed splints to ease the pain, but to no avail. (Id. at 057, 062–063, 064–065.)

27. Willis filed a request for reconsideration on November 3. She reiterated the contours of her physical disability owing to her arachnoiditis, and expressed disagreement with CNA that any of the alternative occupations suggested by Ms. Glass would accommodate the restrictions prescribed by Dr. Johnson. In addition, she mentioned her more recent diagnosis of carpal tunnel. She did not provide medical documentation of this fact, but provided the address of Dr. Johnson in the event CNA would want to investigate the claim further. (Id. at 068.)

28. CNA denied her request for reconsideration, stating "your letter [requesting reconsideration] does not provide medical evidence to support your inability to work at other occupations." It also notified her that her request would be forwarded to the Appeals Committee. (Id. at 067.)

29. Counsel for Willis notified CNA by letter dated December 6, 2000, that he intended to submit further evidence to support her claim that she was totally and permanently disabled, and requested that it provide him with a copy of her file, and that it take no action on her appeal until he had had an opportunity to review same. (Id. at 047.)

30. On December 14, counsel requested more time to review the file. In response, CNA notified counsel that Willis' appeal would be taken off the appeal docket for a 90–day period, ending March 14, 2001, at which point it would be reinstated and reviewed within a 60–day period. (Id. at 043, 045 & 047.)

31. On December 15, 2000, Dr. Johnson provided Willis' counsel with a written assessment of Willis' condition. Dr. Johnson reiterated his diagnosis, and noted the following physical limitations: she could

stand or walk for up to two hours a day, sit up to six hours a day, or do a combination of all three for up to six hours a day, but could not remain in any position for more than fifteen minutes at a time; she could lift up to five pounds on occasion; she could not bend or stoop, or use foot controls; she could climb stairs on occasion; and she had limited flexibility and grasping capabilities. In his opinion, her carpal tunnel could prove treatable, and her limitations due thereto alleviated, but for the present, she could not be "gainfully employed at any level." (*Id.* at 057–060.)

32. On February 8, 2001, William T. Cody, an independent Vocational Rehabilitation Specialist, evaluated Willis' prospects of re-entering the workforce in light of her medical condition. He disagreed with Ms. Glass' earlier assessment, and found that Willis would be unable to perform any of the occupations suggested by Ms. Glass due either to the medical restrictions imposed by Dr. Johnson or her insufficient education and training. In his opinion, given her medical and educational limitations, Willis was unable to perform in any occupation. (*Id.* at 051–054.)

33. Willis has documented Mr. Cody's education, training and experience in vocational rehabilitation. (*Id.* at 055–056.)

34. By letter dated February 28, 2001, Willis, through her counsel, renewed her appeal to CNA, enclosing therewith the recent medical reports from Dr. Johnson documenting all of her conditions and limitations, as well as Mr. Cody's vocational rehabilitation assessment. (*Id.* at 048–066.)

35. The CNA Appeals Committee denied her appeal on April 27, 2001. In its letter ("Denial of Appeal"), CNA stated that Willis had not provided medical documentation, at the time her benefits were discontinued, to substantiate her claim that she was totally disabled (i.e., unable to perform in any occupation for which she

was or would become qualified), and that none of the records submitted pursuant to her appeal gave cause to overturn the decision to deny her benefits. CNA discounted the vocational rehabilitation assessment performed by Mr. Cody, and reaffirmed the assessment performed by Ms. Glass. (*Id.* at 038–039.)

36. This lawsuit was filed on June 26, 2002.

## II. *Opinion*

In reviewing the decision of an administrator who has denied ERISA plan benefits, the Court must first determine the appropriate standard of review, and then, subject to the constraints of that standard, determine whether it can be said that the administrator's decision was made in error. The Court will discuss these questions in turn.

### A. *Standard of Review*

■ With respect to the initial question, Willis argues that the Court should employ a *de novo* standard of review, while the Defendants argue that it should apply an "arbitrary and capricious" standard of review.

■ The Supreme Court has stated that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). A district court must determine that the ERISA plan in question gave "a clear grant of discretion to the administrator to determine benefits or interpret the plan" before it reviews the administrator's decision pursuant to the arbitrary and capricious standard. *See Perez v. Aetna Life*

*Ins. Co.*, 150 F.3d 550, 555 (6th Cir.1998) (*en banc* ).

The Court finds that the correct standard of review to be employed in the present case is the arbitrary and capricious standard. The Court reaches this conclusion on the basis of language in the Summary Plan Description ("SPD"). Under ERISA, an employer is obligated to furnish an SPD to each of its covered employees. *See* 29 U.S.C. §§ 1022(a) & 1024(b). Generally, the SPD takes the form of "an employee information booklet which specifically and simply describes the plan's provisions." *Electro–Mech. Corp. v. Ogan*, 9 F.3d 445, 451 (6th Cir.1993). The SPD is to be written "in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a); *see also Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988); *Moriarity v. UTC Plan*, 158 F.3d 157, 162 n. 1 (2nd Cir.1998) (Trager, J., concurring) (noting that Congress found that the predecessor legislation to ERISA had failed to provide adequate notification rights to participants).

The SPD of the Plan at issue in this case is four pages long. (AR at 029–032.) The first page contains the table of contents. "Plan Administrator" is one subject heading included thereunder, and is elaborated upon on the second page of the SPD. (*Id.* at 130.) ITT is listed as the Plan Administrator, followed by the following statement: "The Administrator *and other Plan fiduciaries* have discretionary authority to interpret the terms of the Plan and to determine eligibility for *and entitlement to benefits in accordance with the Plan*." (*Id.* at 130 (emphasis added).) Willis herself has alleged that CNA is a fiduciary of the Plan (Amend.Compl.¶ 4), and it is clear from the manner in which CNA exercises

discretion over the LTD benefits approval process that it comes within the statutory definition of "fiduciary." *See* 29 U.S.C. § 1002(21)(A) (stating that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ."). Given that the SPD gave express notice to Willis that the Plan fiduciaries had the discretionary authority to determine entitlement to Plan benefits, the Court finds that the arbitrary and capricious standard applies.

 Willis, for her part, argues that the placement of this grant of discretion in the SPD, and not in the Plan itself, renders it meaningless. (Doc. # 16 at 1.) She also cites the following disclaimer, included just above the table of contents on the first page of the SPD: "The following section contains information provided to you by the Plan Administrator of your Plan to meet the requirements of [ERISA]. *It does not constitute a part of the Plan or of any insurance policy* issued in connection with the Plan . . . ." (*Id.* (citing AR at 029) (emphasis in original).)

The Court is not persuaded by her argument. Situations vary, and where the question presented concerns the interpretation of ERISA plan terminology, courts tend to look for the governing language in the documents which were actually provided to the employee and written in a manner that was not misleading. For example, where an employer or insurer distributes an SPD to plan participants, but not a copy of the plan itself, and where a participant relies upon certain rights purportedly guaranteed by the terms contained therein, courts will not allow the employer or insurer to disclaim the existence of said rights merely because they

conflict with terms contained in the underlying plan, not made known to the participant. *See, e.g., Edwards,* 851 F.2d at 136; *Aiken v. Policy Mgmt. Sys. Corp.,* 13 F.3d 138, 140 (4th Cir.1993); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir.1991). On the other hand, where a participant is given an SPD but the SPD is misleading, courts will not allow the employer or insurer to enforce any such misleading terms to the detriment of the employee. *See, e.g., McKnight v. Southern Life and Health Ins. Co.* 758 F.2d 1566, 1570 (11th Cir.1985) ("While a plan's summary may be easily understood, it does not fully comply with ERISA if it is not an accurate interpretation of the original pension plan."). In the event the employer provides an employee with a copy of both the plan and an SPD, as part of a single booklet, and the terms contained in each are not in conflict or the employee has not relied to her detriment on conflicting terms in the SPD, the terms of the underlying plan control, without regard to the terms of the SPD. *See, e.g., Lake v. Metropolitan Life Ins. Co.,* 73 F.3d 1372, 1379 (6th Cir.1996).

■ In this case, Willis was provided with a single booklet, the first 23 pages of which were a copy of the Plan, and the final four pages of which were what was denominated the SPD. (AR at 015–033.) The relevant language in the SPD expressly put Willis on notice that CNA, as a fiduciary, had the right to determine her entitlement to benefits. The statement that the SPD "does not constitute part of the Plan" merely expressed an implied truism, and in no manner can it be said that it materially affected Willis' rights under the Plan itself. As noted, ERISA requires that a plan administrator furnish

to each participating employee such an SPD. By its very definition, a "summary plan description" is not part of the plan itself; it is no more than what its title makes it out to be: a summary of a separate, free-standing Plan. *See Bryant v. International Fruit Prods. Co., Inc.,* 793 F.2d 118, 123 (6th Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986). Were it construed otherwise, the SPD itself would have to be summarized (in circular fashion).

■ Importantly, although it is not part of the plan itself, an SPD, being a required ERISA document, is a "plan document," *see Barker v. Ceridian Corp.,* 122 F.3d 628, 633 (8th Cir.1997); *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 949 (8th Cir.1994), *cert. denied,* 514 U.S. 1050, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995); *Alday v. Container Corp. of America,* 906 F.2d 660, 665 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991), the terms of which are traditionally construed alongside the terms used in an underlying ERISA plan to determine the parties' rights and obligations thereunder. *E.g., Sprague v. General Motors Corp.,* 133 F.3d 388, 402 (6th Cir.), *cert. denied,* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998); *Tiemeyer v. Community Mut. Ins. Co.,* 8 F.3d 1094, 1098–99 (6th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1371, 128 L.Ed.2d 48 (1994); *Edwards,* 851 F.2d at 136; *Bryant,* 793 F.2d at 123.[3] For example, the Sixth Circuit has looked to SPDs in other instances in finding that an employer retained the right to amend or terminate an ERISA plan, *Sprague,* 133 F.3d at 401, and, as in this case, to determine whether an insurer retained discretionary authority to deny insurance bene-

---

**3.** This makes sense, given that the SPD is the " 'statutorily established means of informing participants of the terms of the plan and its benefits,' and the 'employee's primary source

of information regarding employment benefits.' " *Aiken,* 13 F.3d at 140 (quoting *Pierce v. Security Trust Life Ins. Co.,* 979 F.2d 23, 27 (4th Cir.1992)).

fits. *See Tiemeyer,* 8 F.3d at 1098–99 (affirming district court's conclusion that the SPD therein did not confer discretionary authority to determine benefits coverage).

Furthermore, the SPD language at issue is not in conflict with the underlying Plan, which contained the following "uniform provisions":

> WRITTEN PROOF OF LOSS. Written proof of loss must be furnished to Us [CNA] within 90 days after the end of a period for which We [CNA] are liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless You [the insured] are legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.
>
> TIME OF PAYMENT OF CLAIM. Benefits will be paid monthly immediately after We receive due written proof of loss.

(AR at 026.) Willis focuses on the "written proof of loss" provision and argues that under Sixth Circuit precedent, such language does not vest in CNA "a clear grant of discretion ... to determine benefits or interpret the plan," as contemplated by the Supreme Court in *Firestone.* CNA focuses on the second provision set forth above, contending that the word "due," in the phrase "due written proof of loss," means "sufficient" or "satisfactory" or the like. It then relies on Sixth Circuit precedent for the proposition that such language is to be construed as a grant of the requisite discretion, such that the arbitrary and capricious standard is to be applied. Willis replies that the use of the word "due" means only that the written proof of loss must be submitted in a timely fashion. Pursuant to the doctrine of *stare decisis,* the court agrees with CNA, given that the Sixth Circuit has accepted the same argument in a case concerning identical language. *See Leeal v. Continental Casualty Co.,* 17 Fed.Appx. 341 (6th Cir. 2001); *see also Carpenter v. CNA,* Case No. C–3–00–398 (S.D.Ohio Dec.3, 2002) (decision and entry sustaining defendant's motion for judgment on the merits and overruling plaintiff's motion for same) (Doc. # 22) (recognizing grammatical appeal of plaintiff's argument, but following *Leeal* on ground of *stare decisis* ).

Because the SPD given to Willis clearly stated that fiduciaries had discretionary authority to determine eligibility for benefits, because CNA was one such fiduciary, because SPDs in general are plan documents which courts regularly consider in construing plan language, and, finally, because nothing in the SPD contradicts anything stated in the underlying Plan, the Court finds that the proper standard of review is the arbitrary and capricious standard.

### B. *The Merits of the Plan Administrator's Decision*

ERISA states that a plan fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a). In reviewing the actions of a plan fiduciary under the arbitrary and capricious standard, "the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions." *Williams v. International Paper Co.,* 227 F.3d 706, 712 (6th Cir.2000) (citation and internal quotation omitted). "Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious."

*Id.* (citation and internal quotation omitted). "The arbitrary [and] capricious standard is the least demanding form of judicial review of administrative action." *Davis v. Kentucky Fin. Cos. Ret. Plan,* 887 F.2d 689, 693 (6th Cir.1989) (citation omitted).

The gravamen of Willis' argument is that CNA determined that she was not totally disabled, for the purpose of receiving permanent LTD benefits, on the basis of reports rendered by non-examining physicians and a Vocational Rehabilitation Specialist of unverified credentials (Ms. Glass), and, in doing so, arbitrarily and capriciously discounted both the respective reports of her treating physician, Dr. Johnson, and a qualified Vocational Rehabilitation Specialist (Mr. Cody), which indicated clearly that she was totally disabled for such purpose, *and* the finding by the SSA that she was permanently and totally disabled. Furthermore, she takes issue with the fact that CNA made its determination in March of 1999, some 18 months before her initial 24–month LTD benefits period was to expire and before she was diagnosed with carpal tunnel, and that CNA did not reconsider its decision once the evidence of her carpal tunnel and updated medical reports were submitted as part of her appeal. (Doc. # 12 at 12–16.)

For their part, the Defendants contend that the medical evidence indicates that Willis was mostly healthy, and at most restricted to a sedentary occupation, and that the independent reviews of her medical record conducted by Drs. Truchelut and Ryan support this conclusion, such that CNA had a "reasoned explanation" for concluding as it did. (Doc. # 17 at 21–23.) Remarkably, they cite Dr. Ryan's wholly unqualified opinion that Willis was using her disabled husband as a role model for her own claim of disability as support for their argument. (*Id.* at 23.) They also cite Ms. Glass' vocational rehabilitation assessment of Willis as evidence that CNA had a reasoned basis to think Willis was not unable to perform in any occupation, and discount the opposite conclusion reached by Mr. Cody as illogical and, in any event, arising after the "relevant time" period. (*Id.* at 23–24.)

Aside from her argument that CNA's decision was arbitrary and capricious because it was rendered 18 months before she was required to prove that she could not work in any occupation for which she was qualified, the Court agrees with Willis that, in all other respects, CNA's action was arbitrary and capricious. In the run of cases, an early determination regarding permanent LTD benefits will give an employee greater time to plan for her future needs, be that with rehabilitation, additional education, or legal action against the plan administrator, and the Court does not see how CNA's early decision, *taken by itself,* has prejudiced Willis herein. That comment notwithstanding, the Court finds that CNA's action was arbitrary and capricious.

As the fiduciary in charge of determining whether claimants were entitled to benefits, CNA was charged under ERISA with discharging its duties in the interest of Willis, a Plan participant. *See* 29 U.S.C. § 1104(a). Obviously, this does not mean that Willis was entitled to benefits merely because she claimed them, but it does mean that CNA had an obligation to perform its duties with "the care, skill, prudence, and diligence" of a reasonable person under the circumstances.

Its reliance upon the opinion expressed by Dr. Ryan that Willis' husband, who purportedly collects disability benefits, provided her with a role model for pursuing a bogus disability claim of her own was, without a doubt, the most glaring indiscretion committed by CNA. Dr. Ryan's intuition may well be accurate, but

any number of other explanations for Willis' claim for LTD benefits, not the least of which being her medical condition, might also have merit. Dr. Ryan, as far as his expertise has been represented to the Court, is simply not qualified to render such an opinion. Of course, he had every right to speak his mind on a matter of behavioral science, given that he did not submit his report as an expert in a court of law, but that he did so only serves to call his opinion as a whole into question. More to the point, CNA's decision must itself be considered somewhat tainted because of its reliance on a report containing such an obviously irrelevant and prejudicial comment.

The Defendants' contention that Willis did not submit, in a timely manner, evidence to support a finding that she was totally disabled, such that she was continuously unable to engage in any occupation for which she was qualified, is dubious at best. At the time the final decision to deny the appeal was made, Willis had been diagnosed with carpal tunnel, a fact made known to CNA. Indeed, CNA had before it a recent report from Dr. Johnson, in which he stated: "Certainly with the combination of the lumbar arachnoiditis, neurogenic claudication and bilateral carpal tunnel syndrome[,] I would find it difficult [to believe] that she would be employable at this time." (AR at 057.) While he acknowledged that he could not determine that her carpal tunnel would be permanent, or that she would never be able to return to gainful employment, he made it clear that at that time, she could not be "gainfully employed at any level." (*Id.* at 058.)

CNA acknowledged in its Denial of Appeal that it considered this report. (*Id.* at 038–039.) Despite Dr. Johnson's clearly stated opinion that Willis was not employable at that time, supported as it was by a battery of medical evaluations (*id.* at 057–

066), CNA stated that "there were no findings that would confirm her inability to perform the occupations or similar occupations indicated in the termination letter," and that "the medical evidence fails to substantiate a condition that would prevent returning to work as noted previously." In light of Dr. Johnson's report, it cannot be said that this decision was rational or its explanation reasoned.

CNA's reliance on the opinion of Dr. Ryan is faulty for several reasons. *First,* as noted above, his opinion appears to have been results-oriented. Because he rendered an opinion that Willis had an ulterior motive to pursue a disability claim, his entire report should have been discounted. Not only does such an opinion lie outside the scope of his expertise, but the fact that he felt compelled to render it calls into question his objectivity in evaluating the subject matter which he is qualified to evaluate, i.e., Willis' medical records. Had the CNA administrator carried out its fiduciary duty to review the record in a fair and impartial manner, in Willis' best interest, *see* 29 U.S.C. § 1104(a), it would have discounted the comments of Dr. Ryan, given their unprofessional, tainted nature. *Second,* nothing in Dr. Ryan's opinion took into account Willis' subsequent diagnosis of carpal tunnel. *Third,* even Dr. Ryan suggested that it would be "reasonable to have an Independent Medical Evaluation done on this patient before considering her totally disabled for a prolonged period of time" (AR at 139), and CNA never ordered that such an evaluation be conducted. Thus, even if Dr. Ryan's opinion had not been tainted by his comment about Willis' so-called "motive" to seek disability benefits, it was arbitrary and capricious for CNA to consider the doubts he expressed about her condition, when even he suggested that his doubts be put to the test by conducting an independent medical evaluation, and it failed to do so.

*Fourth,* Dr. Ryan's opinion, even if accepted as unbiased and even-handed, is overwhelmed by the medical evidence supporting Willis' claim, and could not have been used by any reasonable administrator to form a "reasoned explanation" for denying permanent LTD benefits. Dr. Ryan, as do the Defendants herein generally, stressed everything that *was not* wrong with Willis from a medical point of view, as evidenced by the MRI, myelogram, and C.T. scans she underwent in the spring of 1998. Yet, one need not be a doctor to realize that the human body does not require a malfunction of all its parts before it can be considered, in the employment context, totally disabled. A reasonable administrator, carrying out its fiduciary duty *to the plan participant,* would have focused on the diagnosis of the disabling condition which caused her pain, not on the conditions which were dismissed as not being the cause of her pain. (E.g., if a patient were having trouble walking because of a broken foot, it would make little sense for her physician to dismiss her complaints because X-rays proved her hip, leg and ankle were not broken.)

Dr. Strickler, the radiologist who reviewed Willis' myelogram and post-myelogram C.T. scan, was the first physician to point out the possibility of arachnoiditis. (AR at 195.) Dr. Sheridan, though he did not diagnose Willis as suffering from arachnoiditis, stated that if this were indeed a condition from which she suffered, she could not expect any relief from her pain, even with treatment. (*Id.* at 191.) Dr. Johnson was the first physician to actually make the arachnoiditis diagnoses, in July of 1998, when he noted that she suffered from lumbar arachnoiditis with neurogenic claudication. (*Id.* at 182.) It was at that time that he indicated that Willis would face permanent limitations on what she could do in the employment setting. One month later, Dr. Johnson indicated that it was "at best marginal" that

she would ever be able to return to gainful long-term employment. (*Id.* at 181.) Dr. Truchelut, who offered an independent review of her medical record, did not disagree with Dr. Johnson's diagnosis or assessment of Willis' chances of returning to work. Indeed, he stated that the diagnosis of arachnoiditis was supported by "minimal objective findings on her CT myelogram." (*Id.* at 143.) Furthermore, he agreed that this condition "probably prevents her from performing her own occupation." (*Id.*) The most he said about her long-term employment prospects was that her condition "is not necessarily going to restrict her from sedentary activities in the distant future." (*Id.*) Thus, Dr. Truchelut's opinion corroborates Dr. Johnson's opinion, both of which left open the possibility, but by no means probability, of future employability. At most, Dr. Truchelut was neutral on the question of future employability, recommending that the decision be left to a member of the Peer Review Panel (who turned out to be Dr. Ryan).

Turning to Dr. Ryan's opinion once again, even if it were viewed as the model of objectivity (which it is not), his recommendation, in early November, 1998, was not that Dr. Johnson's diagnosis should be entirely ignored or discounted, but that Willis should be required to undergo an independent medical evaluation "before considering her totally disabled for a prolonged period of time." (*Id.* at 139.) CNA did not request that this evaluation be conducted. Instead, it turned Willis' file over to Ms. Glass, its own employee, for a vocational rehabilitation assessment, which she conducted on December 31, 1998. Based on the workplace restrictions prescribed by Dr. Johnson in July of that year, and making no reference to Dr. Johnson's subsequently-made comment that it was "at best marginal" that Willis could return to gainful employment, Ms.

Glass enumerated four occupations which Willis could perform. In their Motion, the Defendants contend with some frequency that neither Dr. Johnson's diagnosis of Willis, nor Mr. Cody's subsequently-rendered vocational rehabilitation assessment is supported by objective medical evidence. It is interesting to note, therefore, that they rely on Ms. Glass' assessment to support their position herein, even though she paid only lip service to Dr. Johnson's medical reports, and offered no basis for her conclusion that Willis could maintain employment, as a matter of physical capability or of education and training, as an inside education recruiter, an employment recruiter, a temporary services employment counselor, or a job developer.

It is inconceivable to the Court, not to mention arbitrary and capricious, that CNA would so cavalierly look past the concerns of the treating physician and not even heed the advice of the independent physician on the Peer Review Panel (except insofar as it related to an opinion completely outside his expertise), and instead make its determination to deny permanent LTD benefits on the basis of a vocational rehabilitation assessment conducted by one of its own employees, of unverified credentials, which is not substantiated by specific details of how the occupations she recommended would accommodate the restrictions prescribed by Dr. Johnson five months earlier. That her assessment is not substantiated with explicit details is not dispositive on the question of its merits, but given the substantial restrictions placed on Willis by Dr. Johnson, it seems that a reasonable administrator carrying out its fiduciary duties *in the interest of a plan participant* would re-

quire something more than a list of four generic occupational titles before denying benefits on the ground that the participant was not unable to perform in any occupation.

If one adds to this analysis the fact that Ms. Glass did not make note of Dr. Johnson's subsequent comment, of August 20, 1998, that it was "at best marginal" that Willis could ever expect to hold down gainful employment in the future, and the subsequent diagnosis of carpal tunnel, it is even more evident that CNA's decision was irrational, and certainly not one which can be supported by a reasoned explanation.[4]

The facts of this case fall neatly within a prudential rule recently adopted by the Sixth Circuit. In *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir.2003), the Sixth Circuit was presented with a case in which a company executive, Darland, had been diagnosed by his physicians as suffering from a condition which limited his ability to sit or stand for prolonged periods of time, or perform many of the other functions of his sedentary occupation. Despite his physicians' opinion that he was unable to perform his job, Darland's employer denied him LTD benefits, relying upon the contradictory opinions of members of the Peer Review Panel, and its decision was upheld by the district court on summary judgment. Reversing, the Sixth Circuit noted:

> However, none of the medical consultants who were selected by Network Medical Review to sit on the panels ever saw or evaluated Darlan in determining whether he could perform his job. Fur-

---

4. It is true that Dr. Johnson seemed to equivocate on Willis' chances of long-term employability, stating in April of 1999 that she would likely be able to work if she could find an occupation which accommodated her restrictions. (AR at 124.) However, the opinions of Ms. Glass and Dr. Ryan, and CNA's initial decision to deny permanent LTD coverage after September 11, 2000, were all made a month earlier, in March of 1999, so CNA cannot claim that it relied on this comment at that time.

ther, the conclusions of the peer review panelists were clearly contradicted by the opinions of the physicians who actually examined and evaluated him. Thus, the issue becomes whether the opinions of Darland's treating physicians should be entitled to greater weight than those of the medical consultants hired by Fortis to review Darland's medical records. 317 F.3d at 531.

Finding the question to be one of first impression in the Sixth Circuit, the appellate court answered its question in the affirmative. The Court reviewed the history of the so-called "treating physician rule," noting its origins in the Social Security benefits context, and examining the decisions of other federal circuit courts which have extended the rule to the ERISA context. *Id.* at 531–32. It stated: "In our view, the treating physician rule should apply in ERISA cases, requiring courts to defer to the opinions of a claimant's treating physicians unless there is substantial evidence contradicting them." *Id.* at 532. Because a treating physician is " 'employed to cure and has a greater opportunity to know and observe the patient as an individual ... [t]his grant of deference to a treating physician's opinions increases the accuracy of disability determinations by forcing the [administrator] who rejects those opinions to come forward with specific reasons for his decision, based on substantial evidence in the record.' " *Id.* (quoting *Regula v. Delta Family-Care Disability Survivorship Plan,* 266 F.3d 1130, 1139 (9th Cir.2001)) (alterations added).

In *Darland,* finding that the district court had erred in not deferring to the opinions of Darland's treating physicians, particularly given the weak contradictory evidence adduced by the physicians on the Peer Review Panel, the Sixth Circuit reversed the district court's judgment upholding the insurer's decision to deny ben-

efits, adding that the treating physician rule "has particular applicability" in situations where the opinions of treating physicians differ starkly from those of the peer review physicians, where the peer review physicians have not supported their conclusions and where the plan administrator, who hired the peer review physicians, "had a financial stake in the matter as the insurer who ultimately pays the benefits." *Id.* at 533.

In this case, Dr. Ryan never evaluated Willis. To the extent CNA relied on his opinion to question the opinion of Dr. Johnson, and in the absence of substantial medical evidence contradicting the latter's opinion, it acted without regard to the treating physician rule. Thus, not only is CNA's reliance upon Dr. Ryan's opinion suspect because of that doctor's decision to opine, outside the scope of his expertise, on a supposed ulterior motive Willis might have had for seeking permanent LTD benefits, but it is also so because that doctor's opinion is legally insufficient to override the opinion of Dr. Johnson. CNA's reliance thereon is further called into doubt by its own potential ulterior motive, as the ultimate payor of LTD benefits, to adopt a medical opinion (as well as a vocational rehabilitation assessment) opposing the merits of a claim of disability. Indeed, the application of the treating physician rule is even more appropriate in this case, given the fact that CNA did not even pay heed to the full of Dr. Ryan's opinion. As has been noted, even Dr. Ryan suggested that Willis be directed to undergo an independent medical evaluation. By not following this advice, CNA acted arbitrarily by recognizing Dr. Ryan's opinion only to the extent it cast doubt upon the opinion of Dr. Johnson, and rejecting it to the extent it recommended further consideration of Willis' claim. (Notably, had CNA obtained the independent medical evaluation suggested by Dr. Ryan, it may well have

discovered substantial medical evidence contradicting the opinion of Dr. Johnson, justifying the denial of benefits in legitimate fashion.)

The Defendants also harp on the issue of timeliness. In their Motion, they state that Dr. Johnson's revised opinion that Willis was likely not employable given her newly diagnosed carpal tunnel, rendered on December 15, 2000, was offered "more than three months" too late, and that Mr. Cody's vocational rehabilitation assessment was submitted "almost five months after the relevant time period," relative to the expiration of Willis' initial 24–month period of LTD benefits, and the end of her Plan coverage, on September 11, 2000. (Doc. # 12 at 21, 24.)[5] Before the Court addresses this issue, it should be emphasized that, for the reasons already stated, CNA's action denying Willis' appeal was arbitrary and capricious, regardless of whether it took into account the evidence of occurrences arising after September 11, 2000.

■ Turning to the issue of timeliness, the assertion that Dr. Johnson's opinion of December 15, 2000, indicating that Willis was probably not employable at that time, given her recent diagnosis of carpal tunnel, and Mr. Cody's vocational rehabilitation assessment, rendered on February 8, 2000, were untimely is belied by the sentiments expressed by CNA in the Denial of Appeal. Donna A. Gatling, the Appeals Committee member who drafted the Denial, stated in no uncertain terms to counsel for Willis that "[a]ll reports have been taken into consideration either [sic] submitted by your office or from the medical consultants." (AR at 039.) What is more, it is

apparent from the rest of the Denial of Appeal that the medical documentation submitted after September 11, 2000, including Mr. Cody's assessment, was in fact considered, and that neither Willis' appeal nor any portion of the evidence adduced in support thereof was rejected on grounds of timeliness or relevance. It is therefore disingenuous for the Defendants to speak of a "relevant time period."

Furthermore, CNA expressly left the door open to the submission of more evidence. Counsel for Willis informed CNA that he would be submitting "further evidence" of her medical condition and asked it to refrain from taking action on her appeal until such time as he could do so. (*Id.* at 047.) In response, far from denying this request as improper under the terms of the Plan, or restricting his evidence to injuries arising on or before September 11, 2000, CNA granted his request without restrictions, and gave him 90 days to "perfect" her appeal. (*Id.* at 043.) Counsel performed per the terms set forth by CNA, so for the Defendants to claim now that Dr. Johnson's opinion of December 15, 2000, and Mr. Cody's vocational rehabilitation assessment of February 8, 2000, included with the appeal materials, were untimely, is to overlook the window of opportunity that CNA created, and the fact that both materials were actually considered by CNA, as noted above.

The Court has no doubt that CNA could have limited the scope of Willis' appeal to the submission of evidence of injuries occurring on or before September 11, 2000. This follows from the language of the Plan. Under the definition of "injury," the Plan clearly states that the injury must occur,

---

5. While the Court need not rely on Mr. Cody's assessment to find that CNA acted arbitrarily and capriciously, it can be pointed out that to the extent it is relevant, Mr. Cody's assessment was significantly more in-depth than that of Ms. Glass. (*See* AR at 051–054.) In addition, whereas the Defendants have not submitted any extraneous documentation detailing Ms. Glass' education and training, that of Mr. Cody is well documented, and extensive.

and the resulting disability must begin, while a participant's coverage is in force. (*Id.* at 021.) The Plan does not define "in force," and one could argue that coverage ceases being in force at its expiration, regardless of an existing right of appeal. Of course, one could also argue that coverage should be considered in force as long as the right of appeal exists, but because the Court has already determined that CNA had the right to interpret the terms of the Plan, it realizes that it would not be arbitrary or capricious to determine that coverage ceases to be in force upon the expiration of benefits, notwithstanding the right to appeal.

Notwithstanding what action CNA *could have* taken, the Defendants' current attempt to dismiss the relevance of the materials concerning the existence and effect of Willis' carpal tunnel lacks merit because, in the Denial of Appeal, CNA expressly acknowledged that it did, in fact, consider Willis' medical records and Mr. Cody's vocational rehabilitation assessment, which came into existence after September 11, 2000, and concerned in large part Willis' carpal tunnel. Given the substance of these records, to the extent they were considered by CNA, it was arbitrary and capricious to determine that Willis was not continuously unable to engage in any occupation for which she was or would become qualified. In any event, as the Court has already noted, CNA's actions were arbitrary and capricious, even if it could state in good faith that it was only required to rely upon the medical evidence presented to it no later than September 11, 2000.

Based on the reasoning set forth above, the Court finds that CNA acted arbitrarily and capriciously when it denied Willis' appeal for LTD benefits extending past September 11, 2000. However, that it acted in such fashion does not necessarily mean that Willis is entitled to permanent LTD benefits. In truth, it was not so much CNA's *conclusion* that benefits should be denied that was arbitrary and capricious, as it was the manner in which it went about reaching it. As the Defendants point out, and as the Court has noted, Dr. Johnson was not firm in his conviction that Willis could not, prior to September 11, 2000, perform in any sedentary occupation. Additionally, as the Court has also noted, it is arguable that any disabling condition that Willis suffered subsequent to September 11, 2000, should not be deemed a covered "injury" under the terms of the Plan. All the Court has concluded herein is that CNA acted arbitrarily and capriciously in, *first,* discounting the significant restrictions placed upon Willis by Dr. Johnson, owing to her diagnosed condition of lumbar arachnoiditis with neurogenic claudication, and, *second,* denying her permanent LTD benefits even after considering her more recently diagnosed condition of carpal tunnel.

As to the first arbitrary and capricious act, the problem is not that benefits were denied, but that they were so on the basis of the unsupported, conclusory vocational rehabilitation assessment conducted by Ms. Glass and the opinion of Dr. Ryan, compromised as it was by his opinion, offered outside the scope of his expertise, that Willis had an ulterior motive for claiming disability benefits which had nothing to do with her medical condition. Furthermore, CNA's lack of regard for Dr. Ryan's suggestion that an independent medical evaluation of Willis be conducted was also arbitrary and capricious, in light of the significant workplace restrictions which Dr. Johnson had otherwise imposed upon her. As to the second arbitrary and capricious act, the problem is not that CNA disregarded probative evidence of Willis' injuries diagnosed after September 11, 2000, but that the Defendants are now disingenuously attempting to portray this

evidence as irrelevant, even though CNA expressly stated that it did take such evidence into consideration in ruling on Willis' appeal. To the extent CNA considered such evidence, denying benefits was arbitrary and capricious because Dr. Johnson made it clear that with her carpal tunnel, it would be difficult for Willis to hold down gainful employment of any kind. This is not to say CNA was required to consider this evidence, only that it erred in not recognizing its gravity given that it did so consider it.

What all of this means is that it is not clear from the administrative record that Willis is entitled to permanent LTD benefits, only that CNA acted arbitrarily and capriciously in denying said benefits in the manner it did. The record is incomplete, and further fact finding is necessary to complete a proper review of Willis' claim. It is proper for this fact finding to be conducted by CNA. *See Williams*, 227 F.3d at 715 (recognizing that remand is proper where there are factual determinations that yet need to be made in order to determine whether a participant is entitled to benefits); *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 841–42, 852 (6th Cir.2000) (remanding case to district court with instructions to remand the claim to the claim administrator, for the second time, to reconsider its decision in light of the opinion of the appellate court); *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir.1996) (stating that remand is appropriate where an ERISA plan administrator "fails to make adequate findings or to explain its grounds adequately

... unless the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground"), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2nd Cir.1995) (remanding case to district court with instructions to remand the claim to the claim administrator, finding that "[t]he present record is incomplete and we therefore cannot conclude that there is no possible evidence that could support a denial of benefits").

Accordingly, the Court will remand this claim. Upon remand, there are several issues which CNA must address in reconsidering Willis' appeal and issuing a revised decision relating thereto. *First*, in its revised decision, it must articulate clearly to Willis whether evidence of her carpal tunnel, diagnosed after September 11, 2000, was taken into consideration in reaching its conclusion, and state the basis for why such evidence was or was not considered.[6] If said evidence is considered, it must evaluate it as evidence supporting Willis' claim that she is permanently disabled. *Second*, in reconsidering the appeal, it should completely disregard Dr. Ryan's opinion that Willis has a "role model" in her husband to motivate her to seek LTD benefits, unless Dr. Ryan can state a reasoned basis, within his field of expertise and based on the facts known to him, to support this opinion. *Third*, it should seriously consider Dr. Ryan's suggestion to order an independent medical evaluation. For the reasons stated, Dr.

---

**6.** Because a decision not to consider evidence of injuries arising after September 11, 2000, would not appear to prejudice Willis, given that she did not rely to her detriment on any promise of CNA to consider such so far as the Court is aware, CNA will not be estopped from concluding that such is not to be considered. On the other hand, should its decision again be appealed to this Court, Willis will not be foreclosed from presenting an argument as to why such evidence should be considered. The Court's comment that a decision not to consider such evidence would not be arbitrary and capricious will not bind this Court under the law of the case doctrine, given that the issue has not been argued herein by the parties themselves.

Ryan's own medical opinion is subject to serious question, and an independent evaluation at this point would serve a useful purpose for determining Willis' medical limitations, be they those limitations related solely to her lumbar arachnoiditis with neurogenic claudication, or those also related to her carpal tunnel (the scope of the evaluation to depend upon the breadth of evidence deemed relevant to her appeal). *Fourth,* any vocational rehabilitation assessment conducted with respect to the occupational restrictions imposed by Dr. Johnson, assuming the need for said restrictions is not refuted by the results of any independent medical evaluation which may be performed, should identify with particularity how any identified occupations might be suitable to Willis. Courts cannot review the soundness of a decision denying benefits on the ground that other suitable occupations exist, if support for such a ground is not documented. Whether Mr. Cody's assessment will itself prove probative upon reconsideration is up to CNA, though it bears repeating that the administrator's fiduciary duty is to Willis.

*Fifth,* and finally, CNA is to consider the facts and circumstances surrounding the SSA's decision to award benefits to Willis. Depending on the circumstances of a given case, the Sixth Circuit has recognized that a plan administrator's decision to deny LTD benefits may be arbitrary and capricious if the plan participant had been ruled disabled by the SSA, but that the SSA's determination is not dispositive.[7]

*Compare Darland,* 317 F.3d at 528–30 (holding that insurer was estopped from arguing that plan participant was not disabled after it encouraged participant to seek disability benefits from SSA) (citing *Ladd v. ITT Corp.,* 148 F.3d 753, 755–56 (7th Cir.1998)), *with Fuller v. Retirement Plan for Salaried Employees of Brown & Williamson Tobacco Corp.,* 1997 WL 10952, at *4 (6th Cir. Jan.10, 1997) (holding that plan administrator was not bound by the disability determination of the SSA) (citing *Anderson v. Operative Plasterers' and Cement Masons' Int'l Ass'n Local No. 12 Pension & Welfare Plans,* 991 F.2d 356, 358 (7th Cir.1993)). In this case, the decision by the SSA to award benefits to Willis upon the finding that she was disabled does not appear to be supported by any medical documentation. (AR at 073–080, 114–115.) This may very well vitiate the probative value of the SSA's decision, and CNA may ultimately disregard the SSA's decision at its discretion, but it should at least consider said decision in making its own decision. Willis, of course, shall retain the right to raise an estoppel argument consistent with that discussed in *Darland, supra,* should the facts warrant such an argument.

CNA need not open up Willis' appeal to further evidence, it need only review the evidence already in the administrative record in conformity with its fiduciary duty to discharge its duties with respect to the

7. For purposes of receiving SSA benefits, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). Furthermore:

"An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."
*Id.* § 423(d)(2)(A).

Plan "solely in the interest of" Willis. *See* 29 U.S.C. § 1104(a).

Finally, because final judgment on the administrative record would be premature at this juncture, the Court will not consider the argument put forth by Willis for attorney fees. (*See* Doc. # 12 at 17–20.)

III. *Conclusions of Law*

1. The Plan at issue herein vested discretion in CNA, as a fiduciary, to determine a claimant's eligibility for benefits.

2. The proper standard of review of CNA's decision to deny permanent LTD benefits to Willis is the arbitrary and capricious standard.

3. In denying permanent LTD benefits to Willis, CNA evaluated the medical evidence in an arbitrary and capricious manner.

4. Notwithstanding CNA's arbitrary and capricious conduct, the Court cannot say that under a proper evaluation of the medical evidence, Willis would necessarily be entitled to permanent LTD benefits.

5. Given the incomplete nature of the administrative record, Willis' claim must be remanded for further consideration by CNA, consistent with the discussion set forth above by the Court.

Based on the foregoing, Plaintiff Willis' Motion for Judgment on the Administrative Record (Doc. # 12) and Defendant CNA's Cross–Motion for Judgment on Same (Doc. # 17) are OVERRULED. The matter is remanded for further consideration by CNA, consistent with the terms set forth by the Court herein.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.